Gregory Duvinsky The District Court committed several plain errors in this case. First, as the government has conceded, the District Court applied the incorrect burden of proof to Mr. Giha's claim of citizenship. It required Giha to produce a preponderance of the evidence, proof of his citizenship claim. But as the government concedes, the correct standard is substantial credible evidence. Is there a difference between those two? I mean, substantial credible evidence measured against what standard? I mean, substantial evidence is a standard I recognize. But on summary judgment, we're supposed to say a triable issue of substantial evidence. Where have we said that it's not equivalent to preponderance? A preponderance of substantial credible evidence. So the court has said that substantial evidence is more than a mere scintilla, but less than a preponderance of the evidence. Well, that's what we're talking about, the substantial evidence standard, you know, which is a standard for assessing sufficiency. Is that what you're saying is what the standard that's applicable here? Substantial credible evidence seems, you know, something different from that other term of art, doesn't it? Well, a couple of points, Your Honor. So first, so as is clearly established by Supreme Court case law, in summary judgment, parties bear the burdens that they would bear if at trial. And under Madoka Vega, the burden-shipping framework set out, as I've described, a tripartite burden-shipping framework. I think the use of the word credible in the term substantial credible evidence probably leaves some room for patently frivolous claims. You know, I note that in Augusto v. INS, the Supreme Court noted that the testimonial evidence in that case, while highly unusual to use its terminology, was not so unbelievable as to compel disbelief in its probability. So I think my understanding is that what the word credible in that term is doing is allowing some room for the court to, at the extreme end of cases. Right, but what I'm saying is that I'm not sure there's a difference between saying that you have to come up with substantial credible evidence and saying you have to come up with sufficient evidence to permit a trier to find the fact by a preponderance. I'm not sure I see a difference between those two. Well, I think if I understand Your Honor's question correctly, I think it matters in the context of the burden-shipping framework. That is that the burden does shift from my client to the government upon production of substantial credible evidence, which I understand, based on this court's previous case law, to mean something on the order of the substantial evidence term we've discussed. The burden then shifts back to the government to prove my client removable by clearing convincing evidence. And so I'm not sure if I'm answering Your Honor's question, but I think that the burden-shifting framework doesn't contemplate application of the preponderance of the evidence standard. Now, certainly there is a sufficiency of the evidence question, but I think that incorporates the burden-shifting framework that this court elucidated and then documented. And in any event, I think whichever standard is applied in this case, my client has met it. And so apart from that error I discussed, the district court also overlooked dispositive evidence, instead incorrectly concluding that there was, quote, no evidence that Gia adduced in support of this citizenship claim. So that was just that was patently untrue. My client's father testified that he obtained an order of legal separation from a Peruvian court, recognizing his separation from Maria, his- Counsel, that's not the problem as I understand it. The problem is that the magistrate judge said that Maria was not divorced from her first husband. So irrespective of whatever Walter obtained from a judge in Peru before he came to the United States, Peru would not recognize a common-law marriage with Maria because she was never divorced from her previous husband. And that's the problem. Well, I think a few responses to that, Your Honor. So I think as an initial matter, if we take a look at the statute, the statute says that naturalization occurs if there has been a legal separation of the parents. Congress could have written a statute that says if there has been a marriage and subsequent legal separation. But how do you have a legal separation if there was never a lawful conjoining? I think my argument is, Your Honor, that the question of whether there was a valid or legal conjoining is answered by the fact of legal separation. And the reason for that is multifold. Congress wrote a statute that says legal separation. Now, we agree with the point that that implies, as a matter of common sense, a preceding marriage. But what we say is that once you have shown a legal separation, you have conclusively established the fact of the preceding marriage. Now, basically what I'm saying is we should take Congress at its word. And there are compelling reasons to take Congress at its word. The rule that if there is a legal separation ordered by a foreign court that the marriage has been demonstrated is compelled not only by the plain statutory text. But this doesn't feel like a matter of taking Congress at its word. It does. It does. But that's it's a second order question. The problem is, is that Congress is going to is going to allow us to refer to the laws of Peru. Under the laws of Peru, Walter and Maria were never married. You have not come forward. And the magistrate said you haven't come forward with any proof that she was that she could be lawfully married to him. And so the so what that so we didn't the magistrate judge doesn't even really reach the question of the effect of the of the judicial order obtained by Walter. Right. A couple of points. So as an initial matter, just on the point, just to make the point. I think my client did come forward, even accepting that you have to prove a valid marriage that preceded a separation. My client did come forward with that evidence and that evidence, according to the Supreme Court's instruction, as the court well knows, in liberty law, we must be believed. We have expert testimony by a professor at the University of Lima, Professor Gallegos, that during the relevant time period in Peru in the 1970s and 80s, individuals would obtain divorces through the courts of peace and by mutual agreement because of the high cost of divorce for those individuals. So and to the extent I understand that the district court or the government has said that's incorrect. Second, your your honors, we have Walter Diaz testimony, which, again, must be believed on this procedural posture. And Walter testified that he and Maria planned to sacralize their wedding in a church, which didn't happen because of other circumstances. But certainly the inference that must be drawn in favor of my client on this procedural posture is that Maria understood herself to be at liberty to marry again and understood that she was not committing bigamy. As she married my, formalized my client's parents' common law union in a church. And so I think that is, just as on the evidentiary point, I do think we've met our burden, whether it's preponderance of the evidence or substantial credible evidence, such that the burden shifted back to the government. I also wanted to engage with your honor on that. If we leave this point. Yes, sir. What extent do you depend on the Father Walter's testimony? Well, I think I understand that approving law of what is termed a de facto union, I assume is what we would mean by a common law. Correct. Very. Bria, obviously, is absent from the picture. Right. Just take a step back and just remind ourselves of the Peruvian legal framework. A de facto union forms on cohabitation by two persons for a period, I think, of two years or more. And neither the government nor the district court disputed that the de facto union constituted a marital relationship for purposes of former 1432A. Then there is a process called separation of the bodies under Peruvian law, under which a continuous period of abandonment of more than two years creates a separation between individuals in a common law marriage. And so I think the argument we would make, and I understand the government is not contested, that aside from this issue of the first marriage of the mother, that Walter and Maria would have met the requirements of a common law marriage. And then the question would be whether they legally separate. What's the evidence that they actually got a separation? Because what we have is, you know, these orders from the Peruvian court and they're somewhat illegible because they refer to an article. And the English translation is not complete. It just says Article D, and that's not correct. It says, as you can see, it says Article Some Number and then the word for subsection, D. And do we know what that number is? And it's the Code of Minors. It sounds like a custody issue and not necessarily a legal separation. Where's your evidence that this constituted a separation under Peruvian law? Sure. So the testimony that Walter put forward, which, again, to reiterate, must be believed, is that he obtained an order of legal separation from the court. If you look at his affidavit at 4 through 5, he says that the Peruvian court did two things. One, it declared the end of his relationship with Maria. Well, where did he do that? In some oral order? Yes, exactly. I mean, because it's not in this written order. Correct. And it's our contention that his testimony is best understood as saying that the court, in an oral declaration, proclaimed the end of their relationship. And, again, his description of what occurred at that proceeding on this procedural posture must be accepted as true. So I certainly accept the proposition that the written result of that proceeding was a travel authorization. But if you look at his affidavit, he says two things occurred, and he says that repeatedly. He says, one, the judge issued the end of my relationship with Maria and the children's relationship with Maria. And, two, issued written orders of travel authorization permitting the children to Peru. The other thing he says, and that's at ER 74. Does Peruvian law say that he can't issue this travel order unless he first declares a separation of any de facto union? Well, Article 420 of the Civil Code of Peru, which was cited to the district court, says that separation of the bodies is a justification for unilateral exercise of parental authority and suspension of the other parent's parental authority. So there is a mechanism. But that's not the provision that's cited here. Do you know what this article is that they're referring to in the Peruvian order? It's not clear to me. What that says? It's not clear to me, Your Honor. That's not clear to me, Your Honor. But I just want to take a step back and make a point of, I think, comedy and statutory interpretation that might inform this question, which is, I think that Congress contemplated in the statute that a foreign court's issue of an order of legal separation decides the matter and precludes the need for U.S. courts to get mired into debates about the technicalities and formalities of foreign legal proceedings. And the reason for that is, I think, multifold, but I think bedrock principles of comedy instruct that if a foreign court, as Walter has described in his testimony, has issued an order of legal separation, I don't think Congress contemplated that U.S. courts would determine whether or not the foreign court correctly applied its own law to the facts as it interested them. Now, Walter testified that it was counted. Yes, sir. Oh, I'm sorry. I thought there was a question pending. I do have a question. Under Peruvian law, could a judge allow one parent to take two children in his custody out of the country over the objection of the other parent or without declaring that the other parent was either unavailable or legally no longer had an interest in the custody of the child? My understanding under Articles 420 and 421 of the Peruvian Civil Code is that no, that there is a requirement of either abandonment or some sort of alteration of the marital relationship. But I want to also make another point in addition to the other questions of the statute. The district court did not analyze any of these questions. The district court simply said there was no evidence. It did not analyze Walter Diaz's affidavit, and Walter Diaz's affidavit was cited in reference to the district court contrary to the government's arguments. And that's at SCR 37 and 42 through 43. And it did not address the question of whether Walter had sufficiently testified as to a legal Peruvian proceeding. And I, again, do not think Congress contemplated that once a foreign court—and again, we have to accept Walter's representations on this point—once a foreign court issued an order of legal separation, abuse courts would then have to decide whether or not that order was legally correct under that foreign law's jurisdiction. And I think that, you know, in terms of providing clear guidance to regulated parties, I think Congress provided a simple rule for a complex world. A person who comes to the United States and who has followed all of the correct rules that the statute provides, I don't think Congress contemplated that that person would then have to be surprised by an investigator who determines that an ex-spouse did not correctly dissolve her first marriage. I don't think that defines any purpose in this case. Your time's almost expired. I'm going to give you two minutes for rebuttal, but I think we should hear now from Ms. Nahas. You may proceed. Good morning, Your Honors. May it please the Court, Rebecca Nahas for the United States Attorney General. To prevail on his derivative citizenship claim, Petitioner had to show that his parents were legally separated, which presupposes a valid marriage. The District Court— Let me stop you right there, because would you agree that an annulment is a separation for purposes of this statute? That was not resolved below the District Court level, whether the legal separation was proven. It requires a separation. It's an annulment, a separation within the meaning of the statute. It would seem that it is. Perhaps, Your Honor. Manassian is the only Ninth Circuit case that has really addressed the meaning of the term legal separation. And in that case, the Court did find that a separation by virtue of law would be a legal separation, despite not mirroring the exact language of the statute. Right, but then an annulment would—if an annulment counts as a separation, then an annulment by definition says that the marriage was not valid. That's the basis of the separation, so validity doesn't necessarily have quite the meaning you may suggest, because that may be the grounds of separation. There has to be a putative marriage, but whether or not it had to be completely valid in all respects may not be equivalent with the issue of separation. Well, Your Honor, the Court in Barthélemy already decided that legal separation must be preceded by a marriage, and the— But the claim here is that it was preceded by a de facto union. And I understand your argument that it couldn't have been a de facto union because it would be—you know, would have been bigamous, and Peruvian law wouldn't permit any kind of marriage or de facto union if she had not secured a divorce. But, you know, they claim a de facto union. Right, Your Honor. This statute, as interpreted by the Ninth Circuit, requires a marriage. And the reason is that Congress set out in 1432a.3 two pathways to derivative citizenship, automatic derivative citizenship. And one of the pathways is for children born out of wedlock, and the other pathway is for children born to parents who legally separate. So if those two pathways are going to have different meaning under Congress's intent, it would be that the first one is out of wedlock and the second one is a valid marriage. I have not found any authority that would allow a polygamous marriage preceding a legal separation to satisfy that standard that's been set out by Congress. So suppose the facts with whom they've been—suppose that Maria had not, in fact, gotten a divorce, but she lied to him, and they went through a church wedding and they lived as husband and wife, and he discovers it and then sues for divorce on grounds of bigamy and gets an annulment. Is that a separation now for purposes of the statute? Well, I think the position is that the original marriage was not valid under Peruvian law. It wouldn't be sufficient to satisfy the requirement of a legal separation which presupposes a marriage. And in any event, that's not the case at hand. The case at hand—I'd like to address the argument that the travel authorization somehow establishes a legal separation. If you look at the document itself, it's three lines, and it doesn't refer to Maria. It doesn't refer to the marital status. It doesn't refer to a legal separation, an annulment, any language relating to the marital status of Walter and Maria. Rather, all it provides is that it gives permission for Walter to travel outside of the United States with his children. Do you know what this illegible provision of Peruvian law that's referred to here that is not captured in the English translation, what section number that is there? Unfortunately, I don't, Your Honor. What's your response to their argument that they're not relying so much on a written order but on an oral order that is summarized in Walter's declaration? So if we look at Walter's testimony at deposition, it was asked, did you ever obtain an order from the court recognizing legal separation of you and Maria? And he said, of course. The only thing I wanted to do was record that she had abandoned the home so the judge for minors could give me permission to come here to the United States. He even recognizes that the reason he went to the court and alleged that his wife had been, or excuse me, that Maria abandoned him, was in order to get permission to travel to the United States. And I don't think it's surprising that the Peruvian courts would require proof that the mother either abandoned the children or consented to him traveling with them before he could travel with them. That's just anyone, any parent, even unwed parents, can get permission to travel. It's a custody determination over their children. That doesn't presuppose a marriage, a valid marriage. I'll also note in his affidavit, Walter says, the judge declared the end of any relationship between me and the children and Maria. Again, that's referring to the family unit as having separated. And we're not contesting that he got custody of his children and was given permission to travel to the United States with them from the Peruvian courts. But that travel authorization does not amount to a legal separation. And in any event, petitioners are really asking the court to engage in layers of speculation that this travel authorization, which is simply permission to travel, is somehow a legal separation, and that evidence of a legal separation means that Maria and Walter were married, and that means that Maria must have divorced Gandolfo. That's a lot of inferences. And instead, the district court properly looked at the evidence before it, the concrete evidence. But if he claims that there was an oral order that the judge said that I'm declaring an end to this relationship, is that enough? Well, I just read his exact quote, declared the end of any relationship between me and the children and Maria. To me, I read that as an end to the family unit. By virtue of him getting custody of the children. That doesn't definitively establish that the court was recognizing a legal separation. In the court order itself, Manassian in the Ninth Circuit, they didn't decide whether the petitioner needs to come forward with an actual judicial order recognizing the legal separation. But in that case, the petitioner did. He submitted an order from the Court of California using the words of separation by virtue of law. We don't have anything like that here. We have a travel authorization. I'd like to turn to what the government submitted. Of course, it was not the government's burden. Because this is a case involving a foreign birth, the burden shifted to the petitioner to prove his citizenship. And the government does concede this substantial credible evidence. So the burden was on petitioner. Despite that, the government did come forward with evidence of outstanding marriage between Maria and Gandolfo. And it includes a pruvian law which mandates that the court that issues a divorce decree transfer the divorce decree to the municipality where the marriage took place. And that the municipality where the marriage took place must note the divorce in the margin of the marriage certificate. This is mandated by pruvian law. That context, along with the USCIS investigator who explained the RAINAC centralized database in Peru, and explained that the specific municipality where Maria and Gandolfo got married, the San Martin de Porres municipality, had integrated its documents into the centralized database. You certainly have more than enough evidence to support the conclusion that she didn't get the divorce. But the question is, do you have enough to preclude the competing inference that there are gaps in the records, and that she did in fact get it based on the reputational testimony, and then the stated intention that she was eligible to get married in the church that they had planned. So your honor, with respect to that, the district court did properly consider the two affidavits of the purported experts, who generally challenged the reliability and accuracy of the documents in RAINAC. However, they did not at all address the specific municipality where petitioner's mother and Gandolfo married. So the district court noted that, and that's why she didn't find a material dispute of fact. One is that the experts did not at all address whether RAINAC had properly incorporated the documents from that specific municipality, whereas the government's investigator did specify that those documents were incorporated in 2008. The purported experts also didn't address whether the municipality itself properly transferred its records to RAINAC. And as the district court found, significantly the government submitted the marriage certificate belonging to Maria and Gandolfo from that municipality, which means that that certificate was properly recorded and maintained at that municipality and transferred to RAINAC. And had a divorce taken place, it would have been noted on the margin of the marriage certificate, because that was required and mandated under Peruvian law. Counsel, if Maria and Walter were not married, and this child was out of wedlock, Caleb, then what would be the path for citizenship for Caleb? What would he have to show if his father brought him to the United States? Well, a child born out of wedlock under 1432A3, it's only for a child born out of wedlock to a mother who naturalizes. So he would not qualify under that provision, and I'm unaware of any other provision that he would qualify under. So there is no way that if the child is born out of wedlock, that the father, even if he's got all the evidence in the world that a Peruvian court has given him custody, could come to the United States and his child naturalize in that way? That is my understanding, Your Honor. And this was the exact fact scenario in Bartholomew, where the petitioner in that case did bring an equal protection claim, which was rejected by the court. And the idea was that in according automatic citizenship to children, Congress really wanted to limit it to children of parents who both naturalize, in order to protect the parental rights of the alien parent. And so Bartholomew said that certainly Congress acted rationally in carrying out that policy by creating essentially only three exceptions to that general rule, one of them for legal separation, one for children born to mothers out of wedlock, and the other when one of the parents is deceased. If I may return to the purported expert testimony, I'd also just like to point out that this suggestion that Maria may have divorced Gandolfo through the courts of the peace, rather than through the court, there's just simply no evidence of that. It sort of just creates a theoretical possibility that that happened, but we don't have anything concrete or affirmative, even an affidavit from anyone saying that that occurred. So we think that the district court properly considered that contrary evidence. The government maintains that Walter's affidavit saying that it was his understanding that the marriage ended was not properly raised before the district court. That statement appears as paragraph three. It's never cited in any of the opposing papers. The actual statement is not quoted in the opposing papers, and no arguments are made regarding that statement below before the district court judge. But in any event, even if this court does consider it, we don't think it changes the calculation because it's a terse statement. It's my understanding that the marriage ended. We don't have any context to know how Walter knew that, the details surrounding how he learned that. We don't have any sort of foundation for his personal knowledge of that information. Any indication in the community as to marital status, one of the hearsay exceptions? Well, I'm not raising hearsay because he didn't even tell us where he got that information. He just says that it was his understanding, so we're challenging it based on the personal knowledge requirement, that he hasn't laid out a foundation for his personal knowledge. And I'll also note that he doesn't state that Maria and Gandolfo divorced. He simply states that the marriage ended, which, of course, has a colloquial meaning. And many people can. I'm sorry. I see my time is up, Your Honors. Unless you have any questions, the government submits. Thank you. We'll put two minutes on the clock. Thank you very much, Your Honor. So I just want to start by reading what Walter said about the travel. He said he went through an extensive legal process in Peru to have it recorded that Keel's mother, quote, abandoned our marriage. That's at ER 74, paragraph 13. But the district court didn't analyze that affidavit, nor did it analyze the other affidavit we've been discussing. It applied the incorrect burden of proof, as the government concedes, and it concluded erroneously there was, quote, no evidence. So it didn't analyze the affidavits and say that they were not based on personal knowledge or that there was any reason to doubt the credibility of the testimony about the oral rulings of the Peruvian judge. It simply overlooked and disregarded any evidence. So that's point one. Point two, I think it's quite obvious in our view that an affidavit about the marital status of your ex-wife at the time you began dating is based on personal knowledge, personal knowledge gathered from your experience with your ex-wife. The federal rules of evidence exempt that kind of testimony from the hearsay rule. So I think on this procedural posture, with all inferences that must be taken in support of my client, it's quite clear, I think, that what Walter is saying is that Maria told me that she had divorced Gandolfo. And the fact that they were planning a church wedding also strongly indicates, and on this posture again, must be taken to indicate that Maria understood herself to be at liberty to marry Walter in a formal church wedding and would not be coming bigamy if she did so. And so I think the procedural posture here, in combination with the district court's overlooking of the evidence and application of an incorrect legal standard, a minimum requires remand. The court doesn't have any further questions. Thank you. Thank you. The court thanks counsel for the very helpful arguments in this interesting case, and the case just argued will be submitted. And that concludes our calendar for today. The court will be in recess tomorrow.
judges: Bybee, Stearns, Collins